# Illinois Official Reports

## Appellate Court

---

### *In re Marriage of Altman*, 2016 IL App (1st) 143076

---

| | |
|---|---|
| Appellate Court Caption | *In re* MARRIAGE OF HEATHER ALTMAN, Petitioner-Appellee, and JEFFREY BLOCK, Respondent-Appellee (Steven D. Gerage, Contemnor-Appellant). |
| District & No. | First District, Third Division<br>Docket No. 1-14-3076 |
| Filed | July 27, 2016 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 13-D-4828; the Hon. David Haracz, Judge, presiding. |
| Judgment | Affirmed in part, reversed in part and remanded with directions. |
| Counsel on Appeal | Lake Toback, of Chicago (Michael G. DiDomenico and Sean M. Hamann, of counsel), for appellant.<br><br>No brief filed for appellees.<br><br>Paul L. Feinstein and Grund & Leavitt PC (Jamie R. Fisher and David Adams, of counsel), for *amicus curiae*. |

| Panel | PRESIDING JUSTICE MASON delivered the judgment of the court, with opinion.[*] |
| | Justice Lavin concurred in the judgment and opinion. |
| | Justice Pucinski concurred in part and dissented in part, with opinion. |

## OPINION

¶ 1    At issue in this appeal are the "leveling of the playing field" provisions of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/501(c-1) (West 2012)) providing for interim attorney fee awards, and in particular, we are asked to resolve whether, in cases where both parties lack the financial ability or access to assets or income to pay for reasonable attorney fees and costs, (i) one spouse can be required to utilize a nonmarital retirement account to pay attorney fees and (ii) funds already paid to a party's attorney for past services rendered are "available" to be allocated within the meaning of the Act. We agree with the trial court's conclusion that, under the circumstances presented here, a spouse cannot be required to access a nonmarital retirement account to pay interim attorney fees but determine that sums paid to a law firm for services already rendered are not "available" to be allocated, and therefore, we reverse the order holding respondent's former counsel in contempt for failing to comply with an order directing him to disgorge sums paid to him by respondent for past services rendered.

¶ 2    Petitioner, Heather Altman, and respondent, Jeffrey Block, were married on September 5, 2005. The parties had triplets born of the marriage who were five years old at the time these proceedings were commenced. Altman originally sought an order of protection against Block on May 14, 2013, and, shortly thereafter, filed her petition for dissolution of marriage. The two proceedings were consolidated.

¶ 3    Both parties were represented by counsel. Altman has been represented throughout by the firm of Bradford & Gordon, LLC. Block was originally represented by Scott Tzinberg, who was granted leave to withdraw on October 3, 2013. Steven Gerage was then granted leave to appear as substitute counsel. Gerage was granted leave to withdraw on August 14, 2014, and, since that date, Block has proceeded *pro se*.

¶ 4    The record indicates that the proceedings have been "extremely contentious" and the parties "overly litigious," as characterized by the circuit court. There have been numerous pleadings, affidavits, and motions filed by both parties relative to the order of protection filed by Altman. Block also sought his own order of protection and further requested that Altman submit to random drug testing as a result of her alleged abuse of prescription drugs. Additionally, both parties have litigated issues regarding temporary custody, visitation, and parenting time, and several orders have been entered relative thereto, including, due to problems concerning interaction between Altman and Block, an order that pickups and drop-offs of the children occur at a police station. The court eventually had to order Block to leave the police station parking lot within 10 minutes of dropping off or picking up the children

---

[*]This case was recently reassigned to Justice Mason. The author apologizes to the parties for the delay in resolving this appeal.

as Altman claimed that he would sit in the parking lot for an extended period of time in an attempt to confront her on these occasions, and she was required to wait in the police station—either alone or with the children—until he left. A children's representative was ultimately appointed to represent the children and has been required to broker disputes relating to what school and summer camps the children should be enrolled in and parenting time over the summer and holidays.

¶ 5     Substantial discovery was conducted, including interrogatories, notices to produce, subpoenas, and enforcement actions related thereto concerning all issues in this case. The issues of temporary maintenance, child support, and household expenses were also hotly contested. Both parties filed various motions regarding these issues. On March 13, 2014, after further motion practice, the court directed Block to liquidate a marital retirement account and, based on Altman's claim that Block had been using this marital asset to fund not only the litigation, but also expenses unrelated to the support of his children and household expenses, directed that the proceeds be held in escrow by Altman's counsel pending further order.

¶ 6     The financial aspect of the case was further complicated as a result of Block's claim that he was laid off from his employment as a principal of a business, where he earned more than $160,000 per year. In August 2013, Altman filed an emergency petition seeking to require Block to contribute to the parties' household and living expenses. Altman's petition represented that at the end of May 2013, Block was terminated from his employment. The record is not clear as to when Altman learned of Block's termination. Altman is essentially a full-time mother who earns under $30,000 per year as a rabbi. After a multi-day evidentiary hearing,[1] the trial court set temporary child support of $1412.12 per month based on Block's representation that he was currently earning roughly $4441 per month.

¶ 7     Included in the record is Altman's motion to reconsider that order based on her claim that Block falsified his income and utilized sham entities to hide his true income and assets from Altman and the court. Altman's motion attached documents purporting to show that from May 2013 to January 2014, Block earned income of at least $215,000, but paid only $475 in child support. True to form, Block, by then representing himself, filed a counter-motion to reconsider claiming that the court improperly calculated his child support obligation and requesting that it be set at a lower amount. These motions were pending at the time Gerage appealed the contempt finding and so their disposition is not contained in the record.

¶ 8     On February 13, 2014, nine months after Altman first sought an order of protection and after numerous motions and hearings in the consolidated proceedings, some of which are referenced above, Altman filed a petition requesting interim attorney fees in the amount of $36,864.30 for fees already incurred and $25,000 for prospective attorney fees and costs. An amended petition was filed on May 13, 2014. By this time, Altman alleged she had incurred fees of $63,598.68, had paid $9500 and therefore owed her attorneys $54,098.68. Altman requested that Block be ordered to pay the fees or, in the alternative, Gerage be disgorged of the sums that had been previously paid. On June 26, 2014, the children's representative likewise sought an award of fees in the amount of $5784 for past services and $2500 in prospective fees.

¶ 9     It was also disclosed that Altman had access to a nonmarital retirement account valued at approximately $100,000. In response to the interim fee petition, Block contended that Altman

---

[1]The transcript of the hearing is not contained in the record on appeal.

should be required to access that account to fund her attorney fees. Block's response represented that he had paid Gerage $41,500 for services rendered and that he owed his lawyer $17,112.50. Block also represented that he had paid Tzinberg $25,000 and claimed to owe him an additional $18,542.

¶ 10 Following the hearing on Altman's fee petition, the circuit court issued an order on July 16, 2014, indicating that it took into consideration evidence of the financial circumstances of the parties presented during the prior evidentiary hearings on various motions regarding child support and maintenance. The court found that both parties lacked sufficient access to assets or income to pay reasonable attorney fees and costs and that the case presented a classic scenario for invocation of the Act's "leveling of the playing field" provisions. The court recited that Block had paid his attorneys a total of $66,500, Altman had paid her attorney a total of $9500, and, as of June 30, 2014, there was a balance due to Bradford of $62,000. The court found that Bradford was holding $35,000 in his client trust account (the remaining proceeds of Block's retirement account), which represented the balance of the parties' marital assets. The order allocated $33,284 of the $35,000, with $25,000 to Bradford, and $8284 to the children's representative. The court failed to allocate the remaining $1716 held in the account. In addition, the court ordered that Gerage disgorge a total of $16,000 in fees paid for services already rendered and ordered this amount to be paid to Bradford within seven days. The division of the remaining marital assets, plus the disgorgement, resulted in each party's attorney being allocated a total of $50,500.

¶ 11 After Gerage failed to comply with the order, Altman filed a petition for rule to show cause, which ultimately resulted in the contempt order from which Gerage appeals. We granted leave to the Illinois Chapter, American Academy of Matrimonial Lawyers, to appear as *amicus curiae*.[2]

¶ 12 ANALYSIS

¶ 13 At the outset, we note that no appellee's brief has been filed in this case. This is not surprising, of course, given the trial court's determination that both parties lack the financial ability or access to assets or income to pay for reasonable attorney fees and costs. It would stand to reason that they are likewise financially unable to participate in this appeal. Nonetheless, we will address the merits of this appeal under the principles set forth in *First Capitol Mortgage Corp. v. Talandis Construction Corp.*, 63 Ill. 2d 128, 133 (1976) (in the absence of an appellee's brief, a reviewing court should address an appeal on the merits where the record is simple and the claimed errors are such that the court may easily decide the issues raised by the appellant); see also *In re Marriage of Earlywine*, 2013 IL 114779, ¶ 13.

¶ 14 "[A] court order awarding interim attorney fees under section 501(c-1) of the Act is not an appealable interlocutory order." *In re Marriage of Radzik*, 2011 IL App (2d) 100374, ¶ 45; 750 ILCS 5/501(c-1) (West 2012). "However, when a party appeals from a contempt sanction imposed for violating an interim fee order, the contempt finding is final and appealable and presents to the reviewing court the propriety of the underlying order." *Radzik*, 2011 IL App (2d) 100374, ¶ 45. Gerage timely appealed from the court's contempt sanction imposed for his failure to comply with the order of disgorgement of $16,000.

---

[2]*Amicus* takes no position with respect to the first issue raised by Gerage, *i.e.*, that Altman's retirement account should have been considered an asset available to pay her attorneys.

¶ 15 On appeal, Gerage contends that the circuit court erred (1) in determining that both parties lacked access to income or property to pay fees given the existence of Altman's retirement account that she could have accessed in order to pay attorney fees, (2) in interpreting section 501(c-1)(3) to include earned fees already paid to a party's lawyer in the definition of "available funds," and (3) by failing to allocate 100% of funds held by Bradford. Gerage further argues that if this court upholds the trial court's interpretation of section 501(c-1)(3), the result is unconstitutional in that it violates his substantive and procedural due process rights and impairs contract rights. Finally, Gerage requests that the order of contempt be vacated because he had no other avenue for challenging the court's interim fee order.

¶ 16 The issues Gerage raises regarding the propriety of the order directing him to disgorge $16,000 and pay that amount to Altman's lawyers require us to construe the meaning of the Act's "leveling of the playing field" provisions. Thus, we review these issues *de novo*. *In re Marriage of Nash*, 2012 IL App (1st) 113724, ¶ 15.

¶ 17 In construing a statute, the goal of the court is to effectuate the legislature's intent. *People v. Pullen*, 192 Ill. 2d 36, 42 (2000). To this end, a court may consider the reason and necessity for the statute and the evils it was intended to remedy and will assume the legislature did not intend an absurd or unjust result. *Id.* Any inquiry into legislative intent, however, must begin with the language of the statute, which is the surest and most reliable indicator of legislative intent. *Id.* Under the guise of construction, a court may not supply omissions; remedy defects; annex new provisions; substitute different provisions; add exceptions, limitations, or conditions; or otherwise change the law so as to depart from the plain meaning of language employed in the statute. *Superior Structures Co. v. City of Sesser*, 292 Ill. App. 3d 848, 852 (1997). If the language of the statute is clear, its plain and ordinary meaning must be given effect without resorting to other aids of construction. *In re Marriage of Mitchell*, 181 Ill. 2d 169, 173 (1998); *In re Marriage of Beyer*, 324 Ill. App. 3d 305, 309-10 (2001).

¶ 18 Section 501(c-1) of the Act permits predecree assessments of attorney fees in favor of a petitioning party. *In re Marriage of Levinson*, 2013 IL App (1st) 121696, ¶ 27. The purpose of such interim awards is to "address the problem of the 'economically disadvantaged spouse,' where one spouse uses his or her greater control of assets or income as a litigation tool, making it difficult for the disadvantaged spouse to participate adequately in the litigation." (Internal quotation marks omitted.) *In re Marriage of Rosenbaum-Golden*, 381 Ill. App. 3d 65, 74 (2008). This provision was enacted as part of the "leveling of the playing field" amendments in 1997, changing the petition methods and court procedures for interim fee awards in dissolution of marriage actions. *Id.* at 73; see also *Levinson*, 2013 IL App (1st) 121696, ¶ 27.

¶ 19 Subsection (3) of section 501(c-1) contemplates interim awards where one party is able to pay and the other is not and where both parties are unable to pay:

"In any proceeding under this subsection (c-1), the court *** shall assess an interim award against an opposing party in an amount necessary to enable the petitioning party to participate adequately in the litigation, upon findings that the party from whom attorney's fees and costs are sought has the financial ability to pay reasonable amounts and that the party seeking attorney's fees and costs lacks sufficient access to assets or income to pay reasonable amounts. *** If the court finds that both parties lack financial ability or access to assets or income for reasonable attorney's fees and costs, the court *** shall enter an order that allocates available funds for each party's counsel,

including retainers or interim payments, or both, previously paid, in a manner that achieves substantial parity between the parties." 750 ILCS 5/501(c-1)(3) (West 2012). Where one spouse has access to assets that enable that party to pay an attorney and the other spouse does not, section 501(c-1) operates to effect "the legislature's goal *** to level the playing field by equalizing the parties' litigation resources." *Beyer*, 324 Ill. App. 3d at 315. In that instance, an interim fee order may direct a spouse to pay the other spouse's attorney fees. But where both spouses lack the ability to pay attorneys, the statute allows a court to allocate "available funds," including retainers or interim payments, already paid to a party's lawyer.

¶ 20    The first issue raised by Gerage concerns the trial court's determination that Altman lacked access to income or property to pay attorney fees. In particular, Gerage maintains that Altman could have utilized her 403(b) retirement account[3] to pay her attorneys. In the trial court, Block claimed that the account had a value in excess of $100,000 and, therefore, Altman had access to an asset that could be used to pay her attorney fees. We disagree.

¶ 21    Section 12-1006(a) of the Illinois Code of Civil Procedure exempts retirement plans, including individual retirement accounts, from "judgment, attachment, execution, distress for rent, and seizure for the satisfaction of debts." 735 ILCS 5/12-1006(a) (West 2012). Although child support and maintenance obligations are statutory exceptions to this provision (see 750 ILCS 28/15(d) (West 2012)), judgments for attorney fees are not. *Jakubik v. Jakubik*, 208 Ill. App. 3d 119, 123 (1991). This is true even if the fees were incurred to enforce delinquent support or maintenance obligations. *Id.* at 126 ("Illinois's public policy favors the payment of child support and maintenance obligations from exempt property to promote the support of the family, not the support of attorneys. Indeed, payment of attorney fees from sources held exempt for family obligations could deplete such resources so as to leave no assets available to satisfy the support obligation itself.").

¶ 22    Consistent with *Jakubik*, we have previously determined that one spouse cannot be ordered to liquidate and distribute the proceeds of an individual retirement account to satisfy an interim attorney fee award. *Radzik*, 2011 IL App (2d) 100374, ¶ 62. But the question here is somewhat different. Gerage does not contend that Altman could be ordered to liquidate her retirement account to pay her attorneys (or him, for that matter); rather, he contends that Altman's retirement account should have been considered an asset that was available to her, thus precluding a finding that she lacked access to assets to pay reasonable attorney fees.

¶ 23    On this point, Gerage cites our supreme court's decision in *Earlywine*, 2013 IL 114779. Both parties in *Earlywine* represented that they lacked funds to pay their attorneys, but the husband's parents had paid $8750 on his behalf to his attorney. (We discuss in more detail below the significance of the case as it pertains to the issue of disgorgement of earned fees.) The attorney to whom the funds had been paid, like counsel here, was held in contempt when he refused to turn over half the funds to the wife's counsel. On appeal, he argued that the source of the funds—nonmarital funds advanced by his client's parents—was relevant. The supreme court disagreed, stating that "the statute does not distinguish between marital property and nonmarital property for the purpose of disgorgement of attorney fees. The statute contemplates that retainers paid 'on behalf of' a spouse may be disgorged." *Id.* ¶ 30. Gerage

---

[3]A 403(b) plan is a United States tax-advantaged retirement savings plan for public education organizations, some non-profit employers, cooperative hospital service organizations, and self-employed ministers.

reads *Earlywine* as making every asset—no matter the source—fair game in assessing a party's ability to pay attorney fees.

¶ 24    But context matters and we believe the court's analysis in *Radzik* applies here. In *Radzik*, prior to the order directing him to turn over the proceeds of his individual retirement account to his wife to satisfy the interim fee award, the husband had not accessed or borrowed against the account to pay his lawyers. Finding this significant, the court commented:

> "While the IRA is an asset that will be distributed in the final disposition of the marital estate, respondent was not during the litigation drawing any funds from the IRA. In other words, where the IRA benefitted *neither* party in the litigation, forcing its liquidation and distribution did not serve to counter respondent's use of an asset because, by virtue of the account's very nature, respondent could have no expectation of accessing it." (Emphasis in original.) *Radzik*, 2011 IL App (2d) 100374, ¶ 63.

¶ 25    Applied here, *Radzik*'s reasoning compels us to reject Gerage's argument that the existence of Altman's nonmarital retirement account was relevant for purposes of assessing her ability to pay fees. First, unlike the IRA in *Radzik*, Altman's retirement account is a nonmarital asset that will not be distributed in the final property disposition in this case. Second, and more importantly, there is no evidence that Altman has accessed the account for any purpose related to the litigation or that she has any ability to do so, at least not without significant financial penalties. See 750 ILCS 5/501(c-1)(1)(A) (West 2012) (requiring court to consider, *inter alia*, "alleged non-marital property within access to a party" in assessing interim fees). Finally, given the policy reasons underlying the exception of individual retirement accounts from the claims of creditors, including attorneys, and the evidence of record in this case reflecting Block's persistent efforts to avoid or reduce his child support obligations, we would question the wisdom of any finding that Altman should be required to invade this asset to pay her attorneys.

¶ 26    As support for his position, Gerage points to the trial court's order directing Block to liquidate the balance of a marital retirement account and place the funds in escrow subject to further order. But this just illustrates the distinction the *Radzik* court recognized. Block chose to utilize this asset to fund the litigation, among other things. Because Block elected to access this asset, the trial court rightly exercised control over the proceeds to "level the playing field." See *Radzik*, 2011 IL App (2d) 100374, ¶ 64 ("[W]hile the IRA is not currently 'income' *** because respondent receives no periodic payment therefrom [citation], that would change if respondent voluntarily and prematurely cashes out the IRA."). Altman has not accessed her retirement account for any purpose, and there is no evidence that she is receiving periodic payments from that account. Therefore, we reject Gerage's claim that the trial court erred in determining that Altman lacked access to assets that would have enabled her to pay attorney fees.

¶ 27    We next address whether funds paid to an attorney for past services rendered are "available" within the meaning of the Act so that a court may order a law firm to disgorge not only unearned funds held in a client trust or an advance payment retainer account but also funds that the firm has already earned and deposited into its operating account or paid to third parties. Gerage contends that the plain language of section 501(c-1)(3) and, in particular, the use of the modifier "available" before "funds" necessarily means that some funds are "unavailable." Gerage posits that once a fee is earned, title to those funds, as property, has passed to the attorney and the funds are no longer "available" within the meaning of the statute.

¶ 28    *Amicus* agrees and contends that no reasonable reading of the statute permits a court to order an attorney to disgorge funds earned, received, taxed, and spent and direct him to pay those funds to "legal strangers." *Amicus* points to the statute's language that defines "available funds" to include "retainers or interim payments, or both, previously paid" and argues that the legislature contemplated that funds held by a lawyer to secure future services are subject to disgorgement, while funds deducted from a retainer or interim payments for services already rendered are not.

¶ 29    *Earlywine* addressed a related, but not identical, issue. In *Earlywine*, the trial court found that neither the husband nor wife had the resources to pay their respective attorney fees and ordered the husband's attorney to disgorge to the wife's attorney half the fees held by him in an advance payment retainer account. The attorney argued that under *Dowling v. Chicago Options Associates, Inc.*, 226 Ill. 2d 277 (2007), and Rule 1.15 of the Illinois Rules of Professional Conduct of 2010 (eff. Jan. 1, 2010), the advance payment retainer became his property upon payment and the funds were placed in his general account. The terms of the advance payment retainer provided that it was specifically designed to override the "leveling of the playing field" provisions of the Act. See *Earlywine*, 2013 IL 114779, ¶ 6.

¶ 30    Our supreme court concluded that divorce cases were not among the narrow categories of cases where advance payment retainers were necessary and appropriate. "Shielding assets so that one spouse may easily hire an attorney has the direct effect of making it difficult for the other spouse to hire his or her own attorney. This would defeat the purpose and goals of the Act, which is to enable parties to have equitable access to representation." *Id.* ¶ 29. Thus, *Earlywine* stands for the proposition that no matter what form the retainer takes, it is subject to the provisions of section 501(c-1). Because the advance payment retainer had been placed in the lawyer's general account, *Earlywine* did not address any issues relating to whether the lawyer had earned fees by virtue of services rendered.

¶ 31    The Second District of this court did address the issue presented here in *In re Marriage of Squire*, 2015 IL App (2d) 150271. In that case, the wife had borrowed $130,000 from her mother to pay her attorneys. Ten thousand dollars of that amount had been paid to the wife's former attorney and the rest was paid to her current attorney, Stogsdill Law Firm, as a retainer. Although the husband earned a six-figure income, his monthly expenses, including debt-service payments from the couple's bankruptcy, exceeded his income. The wife was unemployed. Under these circumstances, the trial court ordered Stogsdill to pay half of the retainer to the husband's lawyer and entered a contempt finding when he failed to comply. *Id.* ¶¶ 3-7.

¶ 32    On appeal, Stogsdill contended that the fees the firm had earned and deposited into its general account were not "available" within the meaning of section 501(c-1)(3). Relying on the statute's reference to the use of "retainers or interim payments" to "level the playing field," the Second District disagreed. The court found that accepting Stogsdill's position would frustrate the purposes of the statute in that the attorney holding the retainer "would have a strong incentive to earn the fees at an early stage of the litigation" and "could file voluminous pleadings and motions early in the case, thus 'earning' the retainer, while leaving the other spouse to respond to a mountain of paperwork with little chance of obtaining resources to do so properly." *Id.* ¶ 21. Relying on *Earlywine*'s refusal to recognize a law firm's ownership of an advance payment retainer in the context of marriage dissolution proceedings, *Squire* found that it did not matter that the firm had already deducted earned fees from the retainer. *Id.* ¶ 22. The

court concluded: "it is clear that 'available' as used in the statute simply means that the funds exist somewhere." *Id.*

¶ 33    We respect our colleague's decision in *Squire* and the dissent's adoption of its reasoning, and if "leveling the playing field" was the sole consideration in deciding this issue, we would come to the same conclusion. But the legislature chose the word "available" to define those funds, whether in the form of a retainer or interim payments, that could be subject to disgorgement. If the legislature meant that all funds "paid" to one spouse's lawyer were subject to disgorgement when neither spouse was able to pay attorney fees, it could have easily said so. But it seems to us a tortured reading of the statute to say that even though the firm has earned the fees, paid itself (as it was entitled to do), and used that income to pay salaries, overhead, and litigation expenses for items such as experts and court reporters, it can nonetheless be required to refund those fees, not to its client, but to a third party.

¶ 34    Further, *Squire* does not address, we assume because Stogsdill did not raise, many of the considerations urged by Gerage and *amicus*. It is not speculation to predict that some lawyers, particularly solo practitioners and those in small law firms, may be unable to comply with orders to disgorge funds that they have earned over several months and that have been transferred into (and out of) their operating accounts, at least not without serious financial hardship. Here, for example, Altman's lawyers waited nine months after these proceedings were commenced before they filed their initial interim fee petition. Our review of the record reveals that the activity by both party's lawyers during this period of time was intense and, we must assume, time-consuming. It must have been obvious to Bradford that Block, who was at least initially employed earning a six-figure salary, was using marital assets to pay his lawyers, while Altman was only able to come up with $9500. At the same time, in the absence of an interim fee petition, Tzinberg and later Gerage may have assumed that Altman had decided to use her substantial retirement account to fund the litigation. Because of Altman's delay in seeking interim fees, it cannot be said that Block's attorneys were paying themselves at their peril while on notice of the possibility that the court would at some future date order those fees disgorged. Where, as here, the petitioning law firm delays filing an interim fee petition, the financial risk disgorgement poses for the respondent's attorney increases correspondingly.[4]

¶ 35    Gerage also argues that the trial court's interpretation of the statute should have resulted in a disgorgement order against Tzinberg, Block's former lawyer. If fees paid to a lawyer are subject to disgorgement, notwithstanding that those fees have been earned, paid, and passed through the lawyer's operating account, it is logical to extend section 501(c-1)(3) to all attorneys who have represented the client because, under *Squire*'s reasoning, "the funds exist somewhere." *Squire*, 2015 IL App (2d) 150271, ¶ 22. Indeed, to enforce the disgorgement provisions of section 501(c-1)(3) only against the party's current lawyer could encourage "churning" by the first lawyer, secure in the knowledge that the statute's reach will not extend to him or her after withdrawal. But it would be an anomaly, to say the least, that a lawyer,

_____

[4]Were the question here purely a matter of equity, we would be tempted to uphold the disgorgement order given Gerage's (as well as Tzinberg's) conduct in aiding Block's "scorched earth" approach to litigating this case. But the summary proceeding envisioned in connection with an interim fee award is not designed to address or resolve such issues. A trial court may, of course, determine the reasonableness of the fees incurred either by conducting an evidentiary hearing on the interim fee petition (750 ILCS 5/501(c-1)(1) (West 2012)) or in the context of a final fee award. 750 ILCS 5/508 (West 2012).

having been granted leave to withdraw from a case, could be called upon months or years later to write a check to the opposing party's counsel. It is just such an absurd result that our construction of the statute avoids. *Bowman v. Ottney*, 2015 IL 119000, ¶ 17.

¶ 36 We recognize that we are addressing only interim fee awards and that, at least in theory, accounts will be "trued up" when a final dissolution order is entered. See *In re Marriage of DeLarco*, 313 Ill. App. 3d 107, 113 (2000) (interim fees may be deemed to be advances from the parties' marital estate and a court can order any portion of an interim award constituting an overpayment to be repaid at conclusion of case). But when a disgorgement order is specifically predicated on a trial court's finding that *both* parties lack financial ability or access to assets or income for reasonable attorney fees, we must ask how realistic it is to assume that the attorneys will ever be paid. We simply do not believe the legislature intended through section 501(c-1)(3) that the financial burden of leveling the playing field should be borne, in substantial part, by lawyers who must refund, under pain of contempt, fees they have earned. For these reasons, we conclude that funds earned by and paid to a party's lawyer in the normal course of representation for past services rendered are not "available funds" within the meaning of section 501(c-1)(3) and thus reverse the disgorgement order to the extent it required Gerage to disgorge fees he had already earned. Further, because we conclude that this aspect of the disgorgement order was improper, we reverse the order holding Gerage in contempt for failing to comply.[5]

¶ 37 Finally, Gerage contends that the trial court erred in failing to allocate the entire retainer account. There is no explanation in the record for the court's failure to allocate the remaining $1716 in the account. We recognize that a substantial period of time has elapsed since this issue was addressed by the trial court and circumstances may have rendered the question moot. But, if not, the trial court should on remand allocate this sum between the parties.

¶ 38 Affirmed in part, reversed in part and remanded with directions.

¶ 39 JUSTICE PUCINSKI, concurring in part and dissenting in part.

¶ 40 While I agree with my colleagues that under the circumstances presented, a spouse cannot be required to access a nonmarital retirement account to pay interim attorney fees, I respectfully disagree with the majority's statement that it simply does not believe the legislature intended through section 501(c-1)(3) that the financial burden of "leveling the playing field" should be borne, in substantial part, by lawyers who must refund, under pain of contempt, fees they have earned.

¶ 41 The most compelling evidence that the legislature intended section 501(c-1) to allow for allegedly earned fees to be available funds and used for interim fee awards is the express language of section 501 itself, which states that: "If the court finds that both parties lack financial ability or access to assets or income for reasonable attorney's fees and costs, the court *** shall enter an order that allocates available funds for each party's counsel, including retainers or interim payments, or both, previously paid, in a manner that achieves substantial parity between the parties." 750 ILCS 5/501(c-1)(3) (West 2012); *Kaufman, Litwin & Feinstein v. Edgar*, 301 Ill. App. 3d 826, 835 (1998).

---

[5]Based on the result we reach, we need not address the constitutional issues Gerage and *amicus* contend are posed by the interpretation of section 501(c-1)(3) adopted by the trial court.

¶ 42    Further, section 501(c-1) must reasonably be understood in view of the concomitant changes to section 508(a). Section 508(a), when read as an integrated whole, expressly indicates that "interim attorney's fees and costs" may be awarded "in accordance with subsection (c-1) of section 501." This construction further agrees with the amended language of section 102, which defines the goal of interim awards broadly as "substantial parity in parties' access to funds for litigation costs" both "during and after litigation." (Internal quotation marks omitted.) *Beyer*, 324 Ill. App. 3d at 313-14. As amended, section 102 now reads: "This Act shall be liberally construed and applied to promote its underlying purposes, which are to: *** make reasonable provision for spouses and minor children during and after litigation, including provision for timely awards of interim fees to achieve substantial parity in the parties' access to funds for litigation costs[.]" 750 ILCS 5/102 (West 1998); *Beyer*, 324 Ill. App. 3d at 313.

¶ 43    The fee shifting that takes place in an interim fee award order is a temporary reallocation of the parties' marital assets. Further, Gerage has the opportunity to make a claim for all his reasonable attorney fees due at a contribution hearing under section 503. 750 ILCS 5/503 (West 2012). This temporary shifting is in accord with the language of the statute, which is intended to "level the playing field." Neither the interim attorney fees award nor the disgorgement order affects an attorney's claim for a final setting of attorney fees. 750 ILCS 5/508 (West 2012). See *In re Marriage of DeLarco*, 313 Ill. App. 3d 107 (2000) (a matter of discretion, a trial court will award attorneys only fees it deems reasonable).

¶ 44    In *Squire*, the trial court, citing *Earlywine*, held that it did not matter that the fees already belonged to respondent's attorney. *Squire*, 2015 IL App (2d) 150271, ¶ 6 (citing *Earlywine*, 2013 IL 114779, ¶ 25. The trial court granted the interim fee petition and ordered respondent's attorney to pay petitioner's attorney. The appellate court affirmed also citing *Earlywine* and finding that *Earlywine* did not intend to limit its holding to certain retainers. *Id.* ¶ 21. The court found that in *Earlywine*, our supreme court noted that the retainer in question became the law firm's property immediately upon payment and was deposited into the firm's general account but held that the funds were nevertheless subject to disgorgement. From this, the court in *Squire* held that it is clear that "available" as used in the statute simply means that the funds exist somewhere. *Id.* ¶ 22.

¶ 45    In accord with *Earlywine* and *Squire*, and in light of the Act's public policy of including provisions for timely awards of interim fees to achieve substantial parity in parties' access to funds for litigation costs and the fact that it is to be liberally construed, I find the inclusion of any fees paid to an attorney to be considered "available funds" whether earned or unearned, as that determination has not yet been made. *Earlywine*, 2013 IL 114779, ¶¶ 22-23; *Squire*, 2015 IL App (2d) 150271, ¶ 22. As section 503 allows for a claim to be made for contribution and that a disgorgement order is temporary in nature, the attorney has, by statute, the right to recoup all reasonable fees he or she may be owed. 750 ILCS 5/503 (West 2012).

¶ 46    Under section 508, the court must make a determination of reasonableness and necessity in a final judgment. 750 ILCS 5/508 (West 2012). Until then, there has been no final determination of the attorney's earned fees and there has been no determination of the reasonableness or necessity of the fees that Gerage allegedly earned.

¶ 47    The majority found that where the petitioning law firm delays in filing an interim fee petition, the financial risk disgorgement poses for the respondent's attorney increases correspondingly. The majority, in a footnote, indicates that if the question here were just a

- 11 -

matter of equity, they would be inclined to uphold the disgorgement order given Gerage's and Tzinberg's conduct in aiding Block's "scorched earth" approach to litigating this case. The majority indicates that the summary proceeding envisioned in connection with an interim fee award is not designed to address or resolve such issues. I find that the proceeding is specifically designed for such issues, as the purpose of the statute is to "level the playing field" and would argue that this is a matter of equity.